Fred CAMPBELL, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 4-84-00420-CR.

Court of Appeals of Texas,
San Antonio.

Nov. 25, 1987.

Rehearing Denied Jan. 4, 1988.

Don Fidler, San Antonio, for appellant.

Sam Millsap, Jr., Former Crim. Dist. Atty., Fred G. Rodriguez, Crim. Dist. Atty., Sam Ponder, Ernie Glenn, Edward Shaughnessy, III, San Antonio, for appellee.

Before CADENA, C.J., and REEVES and DIAL, JJ.

## OPINION

DIAL, Justice.

Appellant was found guilty of the offense of capital murder of Emory Brantley, Jr. The jury answered the first special issue in the negative, and the trial court then assessed punishment at confinement for life.

In his first point of error, appellant asserts that the trial court erred in excusing venireman, Albert C. Garza, simply because Garza voiced general objections to the death penalty, or conscientious or religious scruples against its infliction.

Appellant's reliance upon *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) as his primary authority in support of the point of error is misplaced. The decision in *Witherspoon v. Illinois, supra,* is not applicable in the instant case because here appellant received a life sentence. *See Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

Additionally, we find that even if *Witherspoon v. Illinois, supra,* were applicable, Garza was properly excluded by the trial court. A complete review of the examination of Garza reveals that if he were selected as a juror in a capital case and

that case reached the punishment phase, he would violate his oath, to render a true verdict, in order to insure that the death penalty would not be assessed. No error on the part of the trial court has been shown. The first point of error is overruled.

Appellant's second point of error complains that the trial court erred in requiring appellant to register an objection for cause to a prospective juror prior to the State being required to accept or challenge a juror.

Prior to trial, appellant filed a motion styled "Defendant's Request to Utilize Peremptory Challenge Following Examination of the Entire Venire." In this motion, appellant contended that a defendant in a non-capital case could make a more sensible exercise of peremptory challenges after examination of the entire panel and was not bound by TEX.CODE CRIM.PROC. ANN. art. 35.13 (Vernon Supp.1987). According to appellant, the application of art. 35.13, *supra,* to a defendant in a capital case constituted a violation of the defendant's right to equal protection under both the U.S. and Texas constitutions. Appellant asked the court to permit the utilization of his peremptory challenges following the qualification of the entire panel. The trial court granted appellant's motion.

On the second day of individual voir dire, appellant informed the court that he "... would like to invoke the first paragraph of 35.13 Code of Criminal Procedure with regard to selection of jurors in a Capital case." Following a discussion, the trial court denied appellant's request, noting specifically that it was because the court had granted the motion to qualify forty-two prospective jurors and then to permit the exercises of peremptory challenges. Generally, a defendant may not create reversible error by his own manipulation. *Beasley v. State,* 634 S.W.2d 320, 321 (Tex.Crim. App.1982). Having requested that art. 35.13 not be applied to the jury selection process in this case and the trial court granting appellant's request prior to the initiation of jury selection, appellant cannot now claim error in the trial court's refusal

of his request on the second day of jury selection that art. 35.13 be made applicable to the remainder of the jury selection proceedings. Any error the trial court may have committed by not following art. 35.13 was invited by appellant's written motion requesting such action and appellant cannot now complain of the very error he invited. *Cf. Ex parte Guerrero,* 521 S.W. 2d 613 (Tex.Crim.App.1975).

Additionally, appellant has not shown he was forced to take an objectionable juror and since punishment was assessed at confinement for life, we fail to perceive, and appellant has not demonstrated, any harm. The second point of error is overruled.

In order to resolve appellant's points of error three through six, a brief summary of the evidence is necessary.

Keith Richardson testified that he was in the company of appellant, Leon Jackson and Zeb Thompson during the late-night hours of June 8, 1983, and the early-morning hours of June 9, 1983. These four went in appellant's car to a location on the south side of San Antonio off Military Drive. They parked the car at a car wash near some apartments. Although the original purpose of the trip was to "score some weed," appellant said that they would burglarize the home if no one was there. Appellant got out of the car and walked to the apartments. Richardson subsequently observed appellant coming with another individual from the apartment area. Richardson said that appellant introduced this individual to the others, but he, Richardson, walked off because he did not want to meet him. This other individual left after a few minutes, and Richardson, appellant, Jackson, and Thompson got back into the car and left. Richardson testified that they all agreed to get back together in the morning, return to the same place, and burglarize it because no one would be home at that time. Richardson further testified that he stayed home and did not meet with the others in the morning as previously planned.

Billy Yarborough testified that he shared apartment No. 1, 119 Saipan in San Antonio with Kenneth Martin and Emory Brantley,

Jr. on June 9, 1983. According to Yarborough, appellant appeared at the apartment door at approximately 2:00 a.m., June 9, 1983, and asked for Brantley. Yarborough told appellant that Brantley was asleep, but appellant stated that he was having car trouble and wanted Brantley to give him a ride home. He told appellant that Brantley did not have a car but that he would awaken him. Yarborough told Brantley that one of his friends was outside, and Brantley got up. Yarborough then went back to bed. Yarborough said that when he got up for work that morning and left the apartment at approximately 7:30 a.m., Brantley was in his own bedroom and appeared to be still sleeping.

Glyne Holder testified that he, Glenn Miller, and Kenneth Martin went to the apartment shared by Martin, Yarborough, and Brantley, on June 9, 1983, at approximately 7:30 or 8:00 that evening. The apartment was situated very close to a car wash. As they entered the apartment, they noticed things were missing. They told Martin to call the police. While Martin was gone, Holder and Miller walked through the apartment to see what was missing. When they went into Billy Yarborough's bedroom, they saw that two televisions and some stereo equipment were missing. They then discovered the body of Emory Brantley, Jr. in the bedroom closet. Miller checked for a pulse and found none.

Kenneth Martin testified that when he, Glenn Miller, and Glyne Holder reached the apartment, he discovered that the door was unlocked. Martin testified that the door was normally locked whether they were there or not.

Both Martin and Yarborough testified as to the various items taken from the apartment including such items as televisions and stereo equipment with large speakers. They both stated that neither appellant nor any one else had their permission to enter the apartment or remove anything from there on June 9, 1983.

Shirley Hodges testified that she lived in apartment No. 3, at 119 Saipan on June 9, 1983. Around 8:00 or 9:00 a.m. on that date she opened the door of her apartment and saw a car parked between apartment No. 1 and No. 2. The car was a maroon Cutlass with a big CB antenna on it. She saw some men in the car and one standing outside of the car. She identified the man standing outside of the car as Zeb Thompson. She said the car contained a lot of items, and she thought these were people moving into the apartments.

Norma Jean Hodges testified that she lived with her sisters, Carol and Shirley, at apartment No. 3 on the date in question. She, as did Shirley, saw the maroon Cutlass with white vinyl top that morning. She stated that there were at least three men in the car and one standing outside who was trying to get into the car. She testified that the car was pretty well loaded, and she could observe stereo equipment, including a turntable and speakers. She also identified Zeb Thompson as the man standing outside of the car.

Zeb Thompson testified that while at his cousin's home around midnight or 1:00 a.m. on June 9, 1983, he met appellant and Leon Jackson. Appellant asked if Thompson could repair his car. Appellant said his car was located at a car wash. Thompson agreed and went to borrow a wrecker. He obtained the wrecker and met with appellant, Leon Jackson, and Keith Richardson. They drove to a car wash near Southwest Military Drive. Appellant also asked Thompson to help him, appellant, move in the morning. Appellant said he would pay Thompson $200.00 for the help in moving. As Thompson hooked the car to the wrecker, appellant walked over to a nearby apartment. He returned about 30 minutes later, and his car was towed to Thompson's home. Thompson sat around drinking, and appellant, Jackson, and Richardson left.

Just as the sun was starting to rise, according to Thompson, appellant and Jackson returned. All three got into Thompson's red and white '74 Cutlass. This car also had a CB antenna. They drove back to the same area as where appellant's car had been towed from that morning but this time parked in the driveway to an apartment. Appellant got out of Thompson's car and went inside the apartment.

Thompson began moving his tools into a different area of his car in order to have room to load things from the apartment. About twenty minutes after appellant entered the apartment, Leon Jackson entered the apartment. Approximately five minutes later, Thompson went into the apartment. According to Thompson, he sat on the couch in the living room watching television, while Jackson and appellant were in the back of the apartment. Thompson stated he did not go into any of the bedrooms. Thompson stated that he helped carry out a television and stereo from the living room. He put some items in the trunk and the rest in the back seat. Appellant and Jackson also carried items from the apartment and placed them in the car. They then drove to Thompson's house and unloaded the items there. Thompson stated that he was going to permit appellant to store his belongings at his, Thompson's, home until appellant found a new place to stay. They then returned to the apartment.

On this second trip, Thompson again parked by the apartment. After loading the car with more items from the apartment, and as they were preparing to leave, Thompson said he saw a white, blond woman in her apartment. He stated that he knew the woman saw him.

As the trio started to leave, appellant said, "The guy might identify us." Leon Jackson got out of the car and went back into the apartment. He returned to the car about five minutes later and said, "The guy ain't going to identify nobody." Thompson testified that he asked Jackson what was going on, but Jackson initially refused to tell him. When Jackson finally did tell him, Thompson said that he told appellant he wanted all the items from the apartment removed from his home. Thompson stated that Jackson admitted hitting the guy with a vase. He heard later on the news that "the guy died," and he told appellant. Appellant called some people who came and bought some of the items taken, including a television. Appellant and Jackson took whatever was left. Thompson received $200.00 from appellant and Jackson.

Thompson admitted that he had given two statements to the police one of which placed the blame upon appellant. He claimed he did this under instructions from Leon Jackson. Thompson stated that Jackson had admitted hitting the victim with the vase but did not tell him about hanging the victim. Thompson learned of the hanging from the radio news. Thompson also admitted having two arguments with Jackson after the incident. Thompson wanted to tell the police and Jackson did not want him to tell the police. On one occasion Jackson pulled a knife on Thompson, and on the other occasion Jackson started shooting at him.

In the charge to the jury, the trial court charged that Zeb Thompson was an accomplice as a matter of law.

Police officers who had responded to Kenneth Martin's call found the bound body of Emory Brantley, Jr. in the bedroom closet. The deceased's hands and feet were bound. A pant leg from a pair of pants was tied around the victim's neck with the other pant leg tied around the closet's clothes hanging rod. A shirt and a piece of wire were also tied around the deceased's neck. There was a broken vase near the body. Although there was no sign of a forced entry, the bedrooms appeared to have been ransacked.

Dr. Vincent Di Maio, Chief Medical Examiner for Bexar County, testified that he performed the autopsy on the deceased's body. Dr. Di Maio testified that from the results of his examination, it was his conclusion that the victim died as a result of asphyxia due to a compression of the neck. He stated that asphyxia can be caused by hanging or strangling. He further concluded that the death was not the result of suicide, accident or disease. He opined that the manner of death was homicide with the primary cause attributed to hanging.

Michael Wheaton testified that he was a close friend of appellant. He stated that on June 10, 1983, appellant had asked him for a ride to Zeb Thompson's house so appellant could pick up his car. Appellant said he was having a water pump put in the

car. Appellant also asked him if he would be interested in a television because appellant knew someone who had one. Wheaton answered affirmatively.

Arriving at Zeb Thompson's home, Wheaton saw Thompson and Leon Jackson. They all went into the house. After settling on a price for the television, appellant and Wheaton went to a credit union. Wheaton obtained the amount agreed upon for the television and gave it to appellant. When they returned to Zeb Thompson's house, appellant gave Leon Jackson the money. Jackson then brought the television to Wheaton's car.

This television was subsequently recovered and shown to have belonged to Billy Yarborough. It was listed as part of the property taken from the apartment at the time of the offense. The television was returned to Yarborough by Detective Michalec of the San Antonio Police Department. No other property taken in the incident was ever recovered.

In his third point of error, appellant contends that the trial court erred in failing to charge the jury on the law of "independent impulse." Appellant timely submitted and requested such a charge and objected to its omission. Appellant's requested charge read as follows:

> If you believe from the evidence beyond a reasonable doubt that an offense was committed and you further believe from the evidence that the death of Emory Brantley, Jr. was caused by the independent impulse of Leon Jackson, or if you have a reasonable doubt as to whether it was, then you will acquit the defendant and return a verdict of "Not guilty."

■ We find that the trial court did not err in refusing appellant's requested charge. There was no evidence raising the issue of independent impulse.[1] The evidence revealed that appellant was an acquaintance of the deceased. According to Keith Richardson, it was agreed by all that the apartment would be burglarized in the morning when no one was there. Appel-

lant was the first of the conspirators to enter the apartment that morning. Instead of cancelling the burglary upon the discovery that Brantley was still in the apartment, they made a decision to carry out the felonious taking of the property and to accomplish this, physically restrained Brantley. It was appellant who called it to the attention of the trio as they were leaving the apartment for the last time that Brantley could identify them. It was appellant's comment which led to Jackson returning to the apartment and then back to the car five minutes later to inform that Brantley would not identify anyone. It was readily foreseeable, having made a conscious decision to carry on with the felony after discovering Brantley was in the apartment, that if they left Brantley alive, he would be able to identify them to the police. The only way to insure that would not happen was to kill him. Such a scenario does not raise the issue of independent impulse. A trial court acts properly in refusing a request to instruct on an issue not raised by the evidence. *Cf. Brooks v. State*, 642 S.W.2d 791 (Tex.Crim. App.1982).

■ The trial court charged the jury, in accordance with TEX.PENAL CODE ANN. § 7.02(a)(2) (Vernon 1974), that they could convict appellant of capital murder only if they found beyond a reasonable doubt that:

> ... the defendant, Fred Campbell, Jr., either acting alone or together with another as a party, did intentionally cause the death of an individual, namely: Emory Brantley, Jr., by hanging or strangling the said Emory Brantley, Jr., by tying an electrical wire, a shirt or pants around the neck of the said Emory Brantley, Jr., and the said defendant, Fred Campbell, Jr., either acting alone or together with another as a party, did intentionally cause the death of the said Emory Brantley, Jr. while in the course of committing or attempting to commit the offense of Robbery upon Emory Brantley, Jr., or if you find from the

---

1. For a discussion of the "independent impulse" theory and when a charge thereon is required, and whether such a charge should ever be re-quired, see the majority and concurring opinions in *Mayfield v. State*, 716 S.W.2d 509 (Tex. Crim.App.1986).

evidence beyond a reasonable doubt that on or about the 9th day of June, A.D., 1983 in Bexar County, Texas, the defendant, Fred Campbell, Jr., either acting alone or together with another as a party, did intentionally cause the death of an individual, namely: Emory Brantley, Jr., by hanging or strangling the said Emory Brantley, Jr. by tying an electrical wire, a shirt or pants around the neck of the said Emory Brantley, Jr., and tying said pants or electrical wire to hanger poles, thereby asphyxiating the said Emory Brantley, Jr., and the said defendant, Fred Campbell, Jr., either acting alone or together with another as a party, did intentionally cause the death of the said Emory Brantley, Jr. while in the course of committing or attempting to commit the offense of burglary upon Emory Brantley, Jr., you will find the defendant guilty of capital murder.

Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you will find the defendant not guilty of capital murder, and next consider whether the defendant is guilty of murder.

Immediately following the above quoted portion of paragraph two of the charge, was the following instruction:

Before you would be warranted in convicting the defendant of capital murder, you must find beyond a reasonable doubt not only that on the occasion in question that the defendant, either acting alone or together with another as a party, was engaged in the commission of robbery or burglary of Emory Brantley, Jr., but also during the commission of the robbery or burglary the defendant, either acting alone or together with another as a party, asphyxiated by the manner and means set forth in Paragraph II, the deceased with the intention of thereby killing Emory Brantley, Jr.

Unless you find from the evidence beyond a reasonable doubt that the defendant, on the occasion in question, either acting alone or together with another as a party, specifically intended to kill the said deceased when he so asphyxiated Emory Brantley, Jr., if he did, you can-

not convict him of the offense of capital murder.

We find that the charge given by the trial court adequately addressed appellant's criminal culpability under the law of parties and fully protected appellant's rights. Cf. LeDuc v. State, 593 S.W.2d 678 (Tex. Crim.App.1979).

The third point of error is overruled.

In his fourth point of error, appellant complains of the failure of the trial court to charge the jury as to whether or not Keith Richardson was an accomplice witness.

 An accomplice witness is someone who participated with another before, during or after the commission of a crime. Gamez v. State, 737 S.W.2d 315 (Tex.Crim. App.1987) and cases cited therein. One is not an accomplice witness if he cannot be prosecuted for the offense with which the accused is charged. Id. The test to be applied is whether a prosecution will lie against the individual under the indictment by which the accused is charged. Id. A witness is not deemed an accomplice witness because he knew of the crime but failed to disclose it or even concealed it. Id. If the evidence is clear that the witness is not an accomplice witness, no charge need be given to the jury either that the witness is an accomplice witness as a matter of law or whether in the form of a fact question the witness is an accomplice. Id.

 The evidence before the jury revealed only that Keith Richardson had known what was contemplated originally as a burglary was going to take place in the morning; that Richardson had agreed to participate in its commission; but there was no evidence that Richardson ever really participated in any manner in the final commission of the offense which formed the basis of the charge against appellant. Under the evidence, Richardson could not be prosecuted for the same offense for which appellant was charged.

The evidence is clear that Keith Richardson was not an accomplice witness, and the trial court committed no error in refusing

appellant's requested charge. The fourth point of error is overruled.

In his fifth point of error, appellant complains that the evidence is insufficient to sustain his conviction. appellant asserts that the evidence produced at trial only amounted to "suspicion" and "mere probability" of his participation in the offense charged.

The pertinent portions of the indictment charged appellant with the offense of capital murder as follows:

... and on or about the

### Paragraph A

9TH day of JUNE A.D., 1983, FRED CAMPBELL, JR. hereinafter called defendant, did then and there intentionally cause the death of an individual, namely: EMORY BRANTLEY, JR., hereinafter called complainant, by HANGING AND STRANGLING THE COMPLAINANT BY TYING AN ELECTRICAL WIRE, A SHIRT AND PANTS AROUND THE NECK OF THE COMPLAINANT, AND TYING SAID PANTS AND ELECTRICAL WIRE TO HANGER POLES, THEREBY ASPHYXIATING THE COMPLAINANT, and the said defendant did then and there intentionally cause the death of the said complainant while in the course of committing and attempting to commit the offense of ROBBERY upon EMORY BRANTLEY, JR.;

### Paragraph B

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present in and to said Court that on or about the 9TH day of JUNE A.D., 1983, and anterior to the presentment of this indictment, in the County of Bexar and State of Texas, FRED CAMPBELL, JR., hereinafter called defendant, did then and there INTENTIONALLY CAUSE THE DEATH OF AN INDIVIDUAL, NAMELY: EMORY BRANTLY, JR., HEREINAFTER CALLED COMPLAINANT, BY HANGING AND STRANGLING THE COMPLAINANT, AND TYING AN ELECTRICAL WIRE, A SHIRT AND PANTS AROUND THE NECK OF THE COMPLAINANT, AND TYING SAID PANTS AND ELECTRICAL WIRE TO HANGER POLES, THEREBY ASPHYXIATING THE COMPLAINANT, AND THE SAID DEFENDANT DID THEN AND THERE INTENTIONALLY CAUSE THE DEATH OF THE SAID COMPLAINANT WHILE IN THE COURSE OF COMMITTING AND ATTEMPTING TO COMMIT THE OFFENSE OF BURGLARY UPON EMORY BRANTLEY, JR.; ...

The standard for reviewing sufficiency of the evidence questions on appeal is the same for direct and circumstantial evidence; that standard is whether, after viewing the evidence in the light most favorable to the verdict of the jury, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Lewis v. State*, 715 S.W. 2d 655, 657 (Tex.Crim.App.1986) and *Jackson v. State*, 672 S.W.2d 801 (Tex.Crim. App.1984).

A review of the evidence produced at trial and previously summarized above, along with the application of the law of parties to the offense, convinces us that any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt. The fifth point of error is overruled.

In the sixth and final point of error, appellant asserts that the trial court erred in holding the evidence to be sufficient to sustain the conviction when the accomplice witness testimony of Zeb Thompson was not corroborated.

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense. TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 1979).

The test to determine the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then examine the testimony of other witnesses to ascertain if

there is inculpatory evidence which tends to link the accused with the commission of the offense. *Brown v. State,* 672 S.W.2d 487, 488 (Tex.Crim.App.1984). It is not necessary that the non-accomplice evidence directly link the appellant to the crime or be sufficient for guilt. Rather, all that is required is that the non-accomplice evidence tend to connect appellant with the offense committed. *Satterwhite v. State,* 726 S.W.2d 81 (Tex.Crim.App.1986). Additionally, as noted by the State in its brief, there is no longer a requirement that the accomplice witness's testimony must be corroborated as to the specific elements that make the crime of murder capital murder. *See Holladay v. State,* 709 S.W.2d 194 (Tex.Crim.App.1986).

In the instant cause, Keith Richardson testified that he was with appellant, Leon Jackson and Zeb Thompson in the early morning hours of June 9, 1983, wherein the group discussed burglarizing a place in order to make some money. Appellant took them to an area of the city off Southwest Military Drive and parked at a car wash near some apartments. Appellant was to go to the apartment to see if anyone was at home. Appellant got out of the car and walked to an apartment. Appellant eventually returned to the car with another individual. According to Richardson, appellant introduced this individual to Zeb Thompson and Leon Jackson. After the individual left, the four agreed to return to the apartment in the morning, when no one would be there, and burglarize it. This testimony shows that appellant picked the particular site for the commission of the offense.

Billy Yarborough testified that appellant appeared at Apt. No. 1, 119 Saipan at 2:00 a.m. asking for the victim, Brantley. Yarborough had seen appellant in the apartment before with Brantley and recognized appellant. Yarborough went and awoke Brantley who went to see appellant. When Yarborough went to work that same morning at approximately 7:30 a.m., Brantley was asleep in his room.

Zeb Thompson was observed standing by a car parked by Apt. 1, 119 Saipan, around 8:00 or 9:00 a.m. by the Hodges sisters. They noticed the car was loaded with stereo equipment. There appeared to be at least two or three black males in the car.

Stereo equipment, televisions, and other items were taken by the perpetrators of the offense.

Michael Wheaton testified that appellant approached him and asked to be given a ride to Zeb Thompson's home. Appellant said his car was being repaired there. Appellant then asked if Wheaton would be interested in buying a television set, and Wheaton said he would. When they arrived at Thompson's home, Wheaton met Thompson and Leon Jackson. When they agreed on the purchase price of the television, appellant accompanied Wheaton to a credit union where Wheaton withdrew some money. Wheaton paid the pre-agreed amount for the television to appellant. Leon Jackson loaded the television into Wheaton's car.

It was shown that this television belonged to Billy Yarborough and had been taken at the time of the offense.

Apt. No. 1, 119 Saipan was located near a car wash and close to Southwest Military Drive.

The non-accomplice testimony reveals that appellant was one of four people who planned to commit a burglary in order to make money by selling the items taken. Appellant picked the particular apartment that was to be burglarized and led the group to the immediate vicinity where the apartment was located. From the evidence it is clear that the apartment was apartment No. 1, 119 Saipan. It was not burglarized during the early morning hours of June 9, 1983, because appellant discovered the residents were there. It was agreed by the conspirators that they would meet in the morning and burglarize the apartment at a time when they believed no one would be there. Zeb Thompson, his vehicle loaded with stereo equipment, and two to three other black males were seen between Apartments No. 1 and No. 2 on June 9, 1983, between 8:00 and 9:00 a.m. The victim was alive in the apartment at 7:30 a.m., June 9, 1983. The victim knew appellant,

and if Richardson's testimony is believed, the victim was introduced to Zeb Thompson and Leon Jackson at the car in the early morning hours of June 9, 1983. A television taken in the June 9th incident was in Zeb Thompson's home on June 10th. Appellant informed Wheaton of the availability for sale of that television and assisted in the actual sale with Leon Jackson and Zeb Thompson, part of the original group of conspirators.

We find the total of such independent incriminating evidence to be sufficient to connect appellant with the offense charged. The sixth point of error is overruled.

The judgment is affirmed.

CADENA, Chief Justice, concurring.

I agree that the judgment should be affirmed, but I would not hold that there was no error in the jury selection process. Assuming that there was error, there is nothing to indicate that such error brought about an improper verdict concerning the guilt or innocence of appellant or the punishment. The error, if any, was harmless.